Filed 12/23/21 In re C.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. J.W. et al., Defendants and Appellants. | E076793<br><br>(Super.Ct.Nos. J281680, J281681, J281682 & J281683)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. Christopher B. Marshall, Judge. Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant J.W.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant E.C.

1

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

At the 18-month hearing, the juvenile court terminated reunification services to defendants and appellants, J.W. (father) and E.C. (mother) (collectively parents). On appeal, mother contends the court erred in denying her request to continue the hearing in order to provide her additional time to reunify with the children. Father maintains insufficient evidence supports the court's finding that there was a substantial risk of detriment if the children were returned to his custody. Mother joins in father's arguments. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

On May 21, 2019, the social worker received a referral alleging the physical abuse of G.C. (born Sept. 2010) by father. It was reported that father hit G.C. in public with a hanger; G.C. sustained a bump on the right side of his forehead. On May 28, 2019, the social worker made an unannounced visit to G.C.'s school where the office secretary informed him that the children had not attended school since April 5, 2019, as mother was "'running from DV.'"

The social worker interviewed mother and the children just outside the motel room where they were now living. Mother said the family was homeless, and she was trying to find a shelter in which to live. Mother said she had left father due to domestic violence

---

[1] On the court's own motion and to compile a coherent narrative, we take judicial notice of the record in a prior related appeal, which this court dismissed on April 29, 2020. (See *In re C.C. et al.* (Apr. 29, 2020, E074070); Evid. Code, §§ 452, 459.)

2

issues.  She said there had been ongoing issues of domestic violence throughout their relationship; she said she had to get between father and the children at times.

J.C. (born Sept. 2007) told mother, who was not present at the time of the incident, that father had hit G.C. with a hanger.  Mother said G.C.'s head was swollen and bleeding above his right eye.  G.C. told mother father "'hit him upside the head.'"  Mother then left with the children.  The social worker interviewed G.C., who had a scar above his right eye.  G.C. reported father had hit him with a metal hanger.  He said it "'really hurt'" and bled; he said he was scared.  G.C. said his mother and siblings had been living at the motel since the incident.

M.C. (born Oct. 2012) spontaneously removed his shirt revealing an "x-shaped scar" on his back.  Mother said M.C. had received the scar from a previous physical discipline from father.  J.C. reported she had seen father hit G.C. with a metal hanger.  The maternal grandmother reported that father had hit G.C. in the face and on the shoulder with a belt and buckle in the past.

Mother later moved into a domestic violence shelter with the children.  Personnel at the shelter said they were providing support services.  Mother had completed the declaration forms for obtaining a restraining order against father but opted not to file because she was fearful of having to see father in court.  Mother said she thought it might make father "'angrier and more vindictive.'"

Personnel from plaintiff and respondent, San Bernardino County Children and Family Services (the department), filed juvenile dependency petitions for each of the children alleging that while in father's custody, G.C. sustained severe swelling to his

3

right eye, which was nonaccidentally inflicted (A-1);[2] that father had engaged in domestic violence in the presence of the children (B-2); that mother had engaged in domestic violence in the presence of the children (B-3); and that while in father's custody, G.C. had sustained severe swelling to his right eye nonaccidentally inflicted (J-4).[3] On July 12, 2019, the court detained the children in mother's custody on the conditions that she would not leave her current domestic violence program, that she would not allow father to have contact with the children, and that she would follow through with obtaining the restraining order.[4]

In the jurisdiction and disposition report filed July 30, 2019, the social worker recommended the court sustain the allegations, remove the children from their parents' custody, and grant them reunification services. J.C. said father hit her on her arm once with his keychain. She recalled a time when father attempted to hit G.C. with the keychain because G.C. had punched father in the face; mother interceded and was herself hit. J.C. said father had slapped G.C. once before.

J.C. reported that after father hit G.C., mother told father not to hit him again; she asked father how he would like it if she hit him with the crowbar she kept in her purse. J.C. reported living in so many places that it was difficult for her to recall them all; the

---

[2] The allegation in G.C.'s petition alleged father had physically abused G.C. by striking him with a metal coat hanger, which resulted in a laceration to the child's forehead.

[3] The J4 allegation was, of course, not alleged in G.C.'s petition.

[4] Father did not appear at the initial detention hearing.

places in which the family had resided included hotels, motels, lots of shelters, the maternal grandmother's home, and mother's friends' homes. J.C. recalled seeing father push mother causing them both to fall to the ground, resulting in mother hitting the back of her head on the wall. J.C. said her parents argued a lot, which scared her.

G.C. said that mother and the children had left father 18 times, the longest of which was for one year. He said they once lived with the maternal grandmother while mother was away for 360 days while trying to find them a home. G.C. said they had stayed in the Travel Inn at least three times, then another motel, then back with father, then back to the Travel Inn. G.C. confirmed J.C.'s report about father hitting him with a keychain. He reported seeing father push and slap mother in the face so hard that she fell to the ground. He said his parents would get into fistfights. G.C. wanted father to stay away from him; he did not want any visitation with father.

Mother denied any physical violence between she and father; she said that father was mostly just verbally abusive to her. She denied leaving father more than twice. She denied living in multiple shelters and motels. Mother denied having her parental rights terminated or any department involvement with her prior child, S.W.; she said that she had voluntarily given S.W. up for adoption. Mother confirmed the incident with the keychain.

Mother had an extensive prior history with the department. As to her previous child, S.W., that history included an unfounded allegation for medical neglect in July 2006; inconclusive allegations of general neglect in September 2006; additional general neglect allegations, which were evaluated out later that same month;

substantiated allegations of severe neglect in October 2006; and the termination of her reunification services and parental rights in September 2009.

As to the current children, an ambulance took J.C. to the emergency room in March 2008, resulting in a concurrent case with S.W. Further history included inconclusive, general neglect and homelessness allegations in May 2009; unfounded allegations of general neglect and physical abuse in April 2013, when father removed a cast on G.C.'s arm; allegations of emotional abuse, which were evaluated out when mother reported verbal abuse by father in front of the children in September 2014; general neglect allegations that mother and the children were in and out of shelters, which were evaluated out in September 2015; general neglect, emotional abuse, and severe neglect allegations in March 2016; general neglect allegations in August 2017, when mother and the children were in a domestic violence shelter; and unfounded allegations of general neglect, including homelessness, in October 2017.

Father had a criminal history, which included battery and assault. The current case was forwarded to the district attorney's office for possible charges of felony cruelty to a child against father.[5]

Mother's proposed case plan included a domestic violence program, general counseling, life skills training, parenting education, and a psychological evaluation. The social worker opined: "The department is worried that mother will once again return to the father as she has countless times before, lose contact with the department, continue

---

[5] The social worker was unable to interview father for the report, as there was no response at his home, and he did not return a voicemail.

transiency with the children, [and] continue to expose the children to domestic violence and physical abuse . . . ." On July 30, 2019, a court granted mother's request for a temporary restraining order against father with respect to she and the children.

On August 1, 2019, department personnel filed amended detention reports and first amended dependency petitions. The amended dependency petitions added additional possible fathers for the children whom mother had identified in court on July 12, 2019. However, mother later claimed that father, whom she said she had begun dating in 2003 and living with in 2010, was the father of all the children.

The first amended dependency petitions also alleged allegations that the parents failed to protect the children from each other's conduct, including repeated domestic violence and intentional physical abuse (B4 and B5). The department now sought to remove the children from mother's custody: "Due to the serious concerns regarding mother's failure to protect as evidenced by her long-standing history of returning to father despite the physical abuse to the children and to her . . . it was determined that a detention warrant would need to be obtained to safeguard the children[] . . . from continued abuse and neglect." On August 2, 2019, the court detained the children from their parents' custody and ordered no visitation with father due to the restraining order.

As recounted in an information to the court report filed September 10, 2019, the social worker was finally able to speak with father. Father denied striking G.C. with a hanger; father said he had slapped G.C. A supplemental police report was attached to the social worker's report and reflected that a sheriff's deputy observed G.C. to have a one-inch scratch to the right side of his forehead.

7

A mediation report dated September 11, 2019, reflected that father submitted on the A-1 and B-2 allegations in all the petitions, the J-13 allegation in the petitions as to C.C. and M.C., and the J-9 allegation in the petition as to J.C. Mother submitted on the B-3 and B-4 allegations in all the petitions. The department agreed to dismiss the B-5 allegations.[6] Mother contested disposition. Father agreed to reunification services, including individual counseling, domestic violence treatment, and anger management and parenting classes.

In an October 18, 2019, information to the court report, the social worker observed that "mother's behavior during visits indicates that mother is in need of direction in how to actively parent her children. [The social worker] observed that the children parent the mother and that mother seems to be at a loss in how to manage as a parent." Mother "attends parenting classes, domestic violence classes, individual counseling, and life skills training classes offered at mother's current shelter." Mother "persistently" claimed that the department was violating the restraining order by giving father supervised visitation with the children. Department personnel believed that the court issuing the restraining order had deferred visitation between father and the children to the dependency court.[7]

---

[6] The department also agreed to dismiss the G allegations relating to the other alleged fathers.

[7] The restraining order reads that the children's visitation with father would be "deferred to dependency court proceedings."

Mother said she had filed for divorce. "[M]other's history indicates that she has left and returned to father multiple times before and after the marriage. Mother did not grasp the safety concern of the substantial probability of her returning to a man she claims to have domestic violence with and who physically abused her children." Mother had completed 12 sessions of counseling, but her counselor reported that she was not benefiting from counseling. Her counselor reported that "'mother is convinced that she has been wronged . . . she sees no need to change . . . mother is not interested in domestic violence intervention . . . .'" Mother had been participating in goal setting sessions with a case manager one to two hours weekly (with 18 sessions attended), a bimonthly parenting education group (8 sessions attended), a bimonthly domestic violence/empowerment group (4 sessions attended), and a bimonthly life skills education group (4 sessions attended). Mother completed a domestic violence program on July 15, 2019.

At the jurisdiction and disposition hearing on October 22, 2019, the court found father the presumed father of the children, sustained the remaining allegations in petitions,[8] removed the children from their parents' custody, and granted the parents reunification services.[9] The court ordered a psychological evaluation for mother.

---

[8] The court dismissed the allegations the department agreed to dismiss at mediation.

[9] Mother appealed the order. Counsel on appeal filed a brief pursuant to *In re Sade C.* (1996) 13 Cal.4th 952. Mother failed to file a personal supplemental brief; therefore, this court dismissed the appeal as abandoned. (See *In re C.C. et al.*, *supra*, E074070.)

9

At a nonappearance review hearing on January 21, 2020, the social worker reported that father had completed his case plan, including anger management, parenting, and victim impact (domestic violence) courses. Father had been demonstrating new, changed behaviors. Father engaged with children during visitation. The children appeared comfortable with father. Mother had the restraining order against father lifted. The parents reported they were living together and had been attending a domestic violence peer group. They agreed to engage in couple's and family therapy.

In the status review report filed June 25, 2020, the social worker recommended the court continue the parents' reunification services. The parents continued to live together. The social worker reported that "[m]other's challenges were during visits . . . in which safety concerns were found such as mother laughing when [C.C.] was hitting [G.C.] with a jump rope, or mother threatening to leave [the] visit early as children were not following her directions." Father was added to mother's visits, "which was helpful as father was able to help mother redirect the children. During visits, mother and father have been able to team to address all the children's needs. Mother accepted the challenge and [was] willing to work on it with wraparound and family therapy."

Mother had completed her therapy by the last court hearing. Mother had enrolled in further therapy. She "has been actively participating in couples' therapy and group couples' therapy with her husband to learn new ways to communicate, and new coping skills during moments of stress." The social worker confirmed with the counselor that mother's "'level of involvement is excellent.'" Mother confirmed she had attended two sessions of the psychological evaluation.

10

Father had completed his services, such as domestic violence, parenting, anger management, and victim impact classes, and couples' therapy. Father also continued to attend classes even though he had already completed his requirements. His level of involvement was described as "'excellent.'" The social worker noted that "[d]ue to parents completing most of their services and hav[ing] shown some behavior changes, [the department] is recommending to continue[] Family Reunification services to provide more time for parents to demonstrate new skills learned and for the children to have unsupervised and/or overnight visits before returning the children."

In a June 26, 2020, information to the court report, the social worker noted that "[o]n April 22, 2020, it was reported that during the unsupervised video chat . . . between mother" and G.C. and M.C., "mother had been arguing with [G.C.] very loud[ly] and [M.C.] was heard in a firm and loud voice to request mother and [G.C.] to stop arguing. After the visit, [the] children's behaviors increased to whining, crying, and taking each others' items." Father's visits continued to be deemed appropriate. The parents had participated in 12 sessions of couples' therapy, in which their participation was described as "'excellent.'" Nevertheless, parents reported that they were separating.

Mother had completed her psychological assessment. The psychologist diagnosed mother as presenting with "Narcissistic Personality Disorder." The psychologist opined that mother was capable of benefitting from counseling services but "needs a significant and extensive amount of time in therapy." He recommended mother "continue with extensive individual therapy with a skilled therapist trained in treating personality

11

disorders." Further, the psychologist recommended that mother complete her domestic violence and anger management courses.

At the contested six-month hearing on July 1, 2020, the court ordered an amended case plan for mother to facilitate the psychologist's recommendations. The court ordered mother's visits to remain supervised and continued reunification services.

In the status review report filed August 31, 2020, the social worker recommended the court continue reunification services. The parents continued to live together. Mother had been probing the children regarding their foster home placements and asking why the foster parents were monitoring video visits.[10] The social worker observed: "During visits, mother and father have been able to learn to address all the children's needs, however, the mother still has challenges regarding redirecting the children when they are displaying negative behaviors. Mother has accepted the challenge and is willing to work on this concern with the assistance of wraparound services as well as during family therapy sessions."

---

[10] The social worker's service logs, which were admitted into evidence at the 18-month hearing on March 23, 2021, reflect that on August 24, 2020, father was authorized for unsupervised visitation once a week for three hours. Father was also authorized to supervise mother's visitation.

The foster parents, with whom J.C. and C.C. had been living for over a year, requested the children be removed due to the parents' accusations to law enforcement that the foster parents were abusing the children.[11] Father had "completed his services and had actively participated in services such as Couples Count, wraparound, and couples' therapy."

The social worker gave mother referrals for additional services on August 20, 2020, in compliance with the court's order. Nevertheless, the social worker noted that mother's "perception is that she has complied with all court orders and that her children should be returned. Mother believes she has done all that is requested of her and is willing to continue to participate in wraparound services, couples' therapy, and family therapy. The mother does understand that she has been asked to complete her services again and has stated that she is willing to participate during the new services." The social worker opined that there was a substantial risk of detriment to the children if they were returned to their parents' custody because mother had "not demonstrated benefit of the completed court-ordered treatment plan, and new referrals have been submitted to repeat case plan services for the mother." On September 18, 2020, the court continued reunification services.

---

[11] In her service logs, the social worker reported that the foster parent said J.C. had an increase in negative behaviors with the increase in unsupervised phone calls with her parents. On August 27, 2020, J.C. reported to the social worker the need to have a change of placement, as she felt the caregivers did not treat her equally. J.C. reported having phone calls with mother and stated, "'we are going to make [the foster parents] lose their license.'" J.C. also reported that the foster parents hit C.C. on the hand. J.C. said, "'I want justice and my mom already said we can take their license.'"

13

In the status review report filed January 19, 2021, the social worker recommended the court terminate the parents' reunification services. The parents continued to live together. "The mother understood that she was asked to complete her services again and has stated that she has participated during the new services." The social worker was informed that mother had completed her individual counseling sessions. However, mother had not completed her other services, which included components for anger management, domestic violence, and parenting.[12] "The mother has not demonstrated benefit of the completed court-ordered treatment plan, and new service referrals were submitted to repeat case plan objectives for the mother."

Father had previously completed his case plan. However, the social worker opined that "[a]lthough father has completed the services and demonstrated some new skills learned, he continues to reside with mother. As the department has informed parents, when assessing a household, both safety and risk is on all adults in the home. Mother has not completed and/or demonstrated new skills learned, which causes a safety [concern] and risk to the minor children."

In a February 23, 2021, information to the court report, the social worker reported that the parents were still living together. The social worker recommended against

---

[12] The social worker reported in her service logs for January 6, 2021, that she had spoken with mother; mother said she had completed her individual counseling and was almost done "and maybe has one more left of each" of her anger management, parenting program, and domestic violence class components. On the same day, the social worker spoke with the service provider who reported that mother had completed four of 12 classes of anger management, six of 12 parenting classes, and six of 12 domestic violence classes.

offering father additional "services to address his failure to protect the children from the mother and his failure to acknowledge the mother as a risk to the children." "Approximately four . . . referrals alleging child abuse by the foster parent has been telephoned in . . . for investigation over the last two months. The referrals were not supported with evidence of abuse as allegations were denied by the minor children."

In the additional information to the court report filed March 19, 2021, the social worker reported that she had monitored two visits between the parents and the children: "The conversation was of appropriate topic between all parties. The father engaged with each child throughout the visitation. The visitations appeared to be a positive interaction between the parents and the four minor children." On February 1, 2021, the social worker submitted a renewal request for services for mother to complete the remaining classes of her case plan; the request was not processed until March 15, 2021." Mother needed to complete six more anger management classes, four more parenting education classes, and six more domestic violence classes to complete her case plan. The social worker submitted a referral for individual counseling services for father, which was processed March 15, 2021. The first appointment was to occur March 18, 2021.

The social worker testified at the contested 18-month hearing on March 23, 2021, that she recommended termination of reunification services because "[t]here are still safety concerns that have not been mitigated through case plan service classes." "The risk is continued aggression that the mom displays, a lack of parenting skills that the mother has not displayed, that places the children at continued risk of similar abuse to continue."

15

The social worker was concerned primarily with aggressive behaviors by mother but never noted any aggressive behaviors or language in her service notes.

The social worker testified that during one visit "there was aggressive and hostile language that was being exchanged between . . . the mom and the foster parent" in front of the children. During a video visit with G.C., the parents opened his birthday presents; he did not receive the gifts until two weeks later: "This upset the child very much, and the child ended up losing his placement as a result of his behaviors that began to escalate from that visit until the child was actually removed because he was very upset over what had happened on this birthday visit that they opened up his gifts, and he did not have his gifts. And his behaviors just began to spiral out of control."[13]

The social worker described another supervised visit with mother, father, and all the children: "Half of the conversation was very appropriate. The children were very happy to all be together. It was the first visit that we had one meeting for all parties to be together in one visit, and Dad did attempt to engage with each and every child independently throughout that visit. He would ask them individual questions, and there was not a concern. It went really smoothly. I did not recall hearing Mom engage with the children during that visit."

The social worker's notes reflect that on August 27, 2020, the foster parents reported that J.C. indicated that the parents were going to cause the foster parents to lose

---

[13] The service logs reflect that the visit occurred on September 17, 2020. G.C. "was upset with the parents and not wanting to talk to [them] because his birthday just passed and he was disappointed." The parents did bring gifts for G.C. to the social worker's office that day, which the social worker gave to G.C.

16

their license. The social worker described issues with the children's placements: "Most of the [children's] placements have been removed and replacement sought as a result of the behavior of the parents. The parents have alienated the foster parents and not worked cohesively as a team with the foster parents and made allegations against the foster parents. And it became where one foster parent in particular became very upset and felt very unsafe in the presence of the parents."

Mother was ordered to complete individual counseling, domestic violence, parenting, and anger management components for her case plan. However, by January, she had only completed individual counseling and only finished half of her remaining services.

The social worker did not believe that the children were at risk in the care of father, but recommended not returning children to him "[b]ecause the mom and the dad are still in a committed relationship together and reside together." "The father has not demonstrated the ability to intervene when the mother has negative behaviors and lack of protective capacity when the mother has negative behaviors; does not redirect and does not step in and deescalate the situation."

Mother testified she had completed two rounds of parenting classes, a domestic violence class, a life skills training class, and counseling. Mother was then required to complete additional individual counseling, life skills, domestic violence, and parenting classes. She completed the counseling and domestic violence components. She had yet to start a family therapy class. She had not completed her anger management classes because her referral had expired; the social worker only renewed it the previous week;

17

mother had continued to attend classes even after the expirations of her referral but could not obtain a certificate of completion because of the expiration of the referral. If the court gave her more time to complete her services, she would remain in her classes until completion: "I'm asking the Court to please continue to reunify the services so that I can have everything that I need."

During argument, minor's counsel noted, "these are kids that do love their parents and do want to be with their parents and have expressed that." The department argued that the parents had not benefited from their services: "The parents have had 18 months of services. The parents have not demonstrated in that 18-month period that they are ready for return." Father's counsel maintained that father had completed his services and had benefited from them.

Mother's counsel requested the court allow mother "additional time to finish the few classes she has left . . . ." Mother's counsel argued the additional time "would not delay permanency for the children because there is a substantial likelihood that the children would be returned to her by the next court date as Mother only has a few classes remaining, such as domestic violence, parenting, and anger management." Her counsel objected to termination of reunification services and requested "additional time to complete her case plan. If the Court is not inclined to give Mother additional time to complete her case plan, I would ask for the Court to continue to offer Mother services under the permanent plan."

The court ruled that returning the children to the parents' custody would "create a substantial risk of detriment to their safety and protection." The court's ruling was based

18

on "listening to the testimony from the mother, who indicates that she doesn't fully believe her actions contributed to the removal of the children; [and] that she still has services to be completed. . . . [T]here was not an indication of benefit" from the services. "The Court does believe that the parents have been interfering with where the children have been placed." "[T]he issues of the foster parents feeling intimidated by the parents, and the Court is not satisfied as to the mother, as well as for the father, that they have benefited from their services."

"The Court notes that . . . father was ordered to have further counseling, and the reason that the father was ordered to have further counseling as demonstrated by [the social worker's] testimony, was that there was a failure to benefit. That he is not intervening when Mother had negative behaviors. He is not deescalating her. He is not redirecting, and there has been inappropriate behavior by himself, as well as the mother with respect to comments made to the children relating to their foster placements that have resulted in at least a contributing factor to the disruption of a number of foster placements for the children."

The court found by clear and convincing evidence that the parents had failed to complete and benefit from their court-ordered case plans. Thus, the court terminated their reunification services.

## II.  DISCUSSION

Mother contends the court erred in denying her request for an extension of time to complete her reunification services. Father maintains insufficient evidence supports the

19

court's finding that the children were at substantial risk of detriment if returned to his custody. Mother joins in father's arguments.

### A. Mother's Extension Request

Mother contends the court erred in denying her request for an extension of time to complete her reunification services. The department maintains mother forfeited the contention because she never requested an extension. Assuming arguendo that she did request an extension, the department argues the court acted within its discretion. We hold that mother did not forfeit the argument but that the juvenile court acted within its discretion in denying the extension request.

"'Although continuances are discouraged in dependency cases' [citation], the juvenile court has authority to grant brief, necessary continuances that are not inconsistent with the child's best interests, while giving 'substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.'" (*In re Abbigail A.* (2016) 1 Cal.5th 83, 95.) "Continuances in juvenile dependency proceedings are disfavored, particularly when they infringe on maximum time limits under the code." (*In re David H.* (2008) 165 Cal.App.4th 1626, 1635.)

"'The 18-month hearing represents a critical juncture in dependency proceedings. [Citations.] At the 18-month hearing "critical" decisions concerning parental rights are made. [Citations.] The Court of Appeal has held: "The Legislature has determined that the juvenile court must embrace or forsake family preservation at this point by circumscribing the court's options." [Citation.] The minor must either be returned to the

physical custody of his or her parent or the court must terminate reunification services.'" (*In re J.E.* (2016) 3 Cal.App.5th 557, 563-564.)

"It is, however, within the court's discretion under [Welfare and Institutions Code] section 352 to continue the 18-month review hearing and extend reunification services up to 24 months upon a showing of good cause. [Citations.] In exercising its discretion under section 352, 'the juvenile court should consider: the failure to offer or provide reasonable reunification services; the likelihood of success of further reunification services; whether [the minor's] need for a prompt resolution of her dependency status outweighs any benefit from further reunification services; and any other relevant factors the parties may bring to the court's attention.'" (*In re J.E.*, *supra*, 3 Cal.App.5th at p. 564.) Counsel's failure to request a continuance forfeits the argument on appeal that the court erred in denying an extension. (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1366; *In re David H.*, *supra*, 165 Cal.App.4th at p. 1636 [mother forfeited argument that court should have granted a § 352 continuance where she failed to articulate the basis for the extension below].)

Here, contrary to the department's contention, mother's counsel did request an extension of time for mother to complete her services. Mother's counsel requested the court allow mother "additional time to finish the few classes she has left . . . ." Mother's counsel argued the additional time "would not delay permanency for the children because there is a substantial likelihood that the children would be returned to her by the next court date as Mother only has a few classes remaining, such as domestic violence, parenting, and anger management." Her counsel objected to termination of reunification

21

services and requested "additional time to complete [mother's] case plan." Counsel even differentiated between his separate requests for an extension of time and, if denied, his request that the court continue to offer mother services: "If the Court is not inclined to give Mother additional time to complete her case plan, I would ask for the Court to continue to offer Mother services under the permanent plan." Thus, mother has not forfeited the issue on appeal.

Nonetheless, we find no abuse of discretion in the juvenile court's implicit denial of mother's request for an extension of time. Although mother had completed extensive services as part of her initial case plan, on July 1, 2020, the court ordered an amended case plan for mother to facilitate the psychologist's recommendations.

On August 20, 2020, the social worker gave mother referrals for the additional court-ordered services. Nevertheless, by January 2021, mother had only completed the individual counseling component. Mother had not completed her programs for anger management, domestic violence, or parenting. Even in the ensuing two months after the social worker's recommendation that the court terminate mother's reunification services, mother had apparently completed only two more anger management classes and no further sessions of the remaining components of her case plan. Thus, other than individual counseling, mother had completed only half her service components in the seven months since the social worker gave her referrals for the additional services. Therefore, the court could reasonably conclude it was unlikely mother would complete the remaining components in the limited amount of time the court could grant her.

22

Indeed, mother had indicated a recalcitrance to complete the second round of services. Moreover, the social worker, both in her reports and in her testimony, reported that mother was not benefitting from the services she had completed. The court rendered a finding that mother had not benefited from her services. Thus, the court could reasonably conclude it was unlikely mother would both complete and benefit from her remaining services in the limited amount of time the court could grant an extension.

Finally, during the entirety of the dependency proceedings, the children had been deprived of a prompt resolution of their dependency status and a stable placement, in large part due to mother's actions. Here, the court had initially detained the children on July 12, 2019. By the time of the time of the 18-month hearing on March 23, 2021, 20 months had elapsed. Mother had made numerous allegations regarding the foster parents, which were unfounded; however, those accusations resulted in frequent changes in the children's placements. Thus, the juvenile court could reasonably conclude that the children's interest in stability and a prompt resolution of the proceedings militated against an extension. In consideration of all these factors, the juvenile court acted within its discretion in denying mother's request for an extension of time to complete her services.

*B. Detriment.*

Father contends insufficient evidence supports the juvenile court's finding that the children were at substantial risk of detriment if they were returned to father's custody. Mother joins father's arguments. Specifically, father contends the social worker's and juvenile court's reliance on the parent's interference with the foster parents does not support a finding of detriment. We disagree.

23

"We begin by recognizing the underlying policy goal in dependency proceedings: "'Family preservation . . . is the first priority when child dependency proceedings are commenced. [Citation.]'" [Citation.] At the 18-month review hearing, there must be a preponderance of evidence for the court to find it would be detrimental to return the children to the parents or the juvenile court must order their return. [Citation.] This burden is squarely on [the department], not the parents. [Citation.] We review the court's determination for substantial evidence." (*M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 659-660.)

At the "18-month review hearing[] the juvenile court must return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being. . . . If the child may not safely be returned to the parents within a maximum of 18 months from removal, the court must develop a permanent plan for the child." (*M.G. v. Superior Court*, *supra*, 46 Cal.App.5th at p. 660.)

"'In deciding whether it would be detrimental to return a child, the easy cases are ones where there is a clear failure by the parent to comply with material aspects of the service plan . . . for example, a mother continued to test positive for illegal drug use, continued to move from place to place, failed to "regularly" attend therapy, and failed to complete her parenting class. This was obviously enough to support a finding of detriment. [¶] The harder cases are . . . where the parent has complied with the service plan, but for some reason has not convinced a psychologist or social worker that it would be safe to return the child to the parent. The problem is not, as it were, quantitative (that

24

is, showing up for counseling or therapy or parenting classes, or what have you) but qualitative (that is, whether the counseling, therapy or parenting classes are doing any good). These are sensitive cases, fraught with emotional overtones, because they invariably deal with an evaluation of the *personality*, *character and attitudes* of the parent.'" (*M.G. v. Superior Court*, *supra*, 46 Cal.App.5th at pp. 660-661.) "[T]he mere completion of the technical requirements of the reunification plan" is insufficient. (*In re Dustin R.* (1997) 54 Cal.App.4th 1141; see *id.* at pp. 1139-1140 ["[C]ompliance with the reunification plan need not be the sole concern of the court, but it must be an indicium of progress toward family preservation."].)

Here, father had completed his case plan. Indeed, father continued to attend classes even though he had completed his requirements. His level of involvement was described as "'excellent.'" Moreover, father had been demonstrating new, changed behaviors. Father engaged with children during visitation. The children appeared comfortable with father. Father was added to mother's visits, "which was helpful as father was able to help mother redirect the children." In August 2020, father, who was having unsupervised visitation with the children, was also authorized to supervise mother's visitation.

However, the social worker opined that "[a]lthough father has completed the services and demonstrated some new skills . . . he continues to reside with mother. As the department has informed parents, when assessing a household both safety and risk is on all adults in the home." However, "[m]other ha[d] not completed and/or demonstrated new skills learned, which causes a safety [concern] and risk to the minor children." The

25

social worker opined that there was a substantial risk of detriment to the children if they were returned to the parents' custody because mother had not completed her services or benefited from the services she had completed.

Substantial evidence supports the court's determination of detriment. First, mother had failed to complete her case plan. On August 20, 2020, the social worker gave mother referrals for the additional court-ordered services. Nevertheless, by January 2021, mother had only completed the individual counseling component. Mother had not completed her programs for anger management, domestic violence, or parenting. Even in the ensuing two months after the social worker's recommendation that the court terminate mother's reunification services, mother had apparently completed only two more anger management classes and no further sessions of the remaining components of her case plan. Thus, other than individual counseling, mother had only completed half of her service components in the seven months since the social worker gave her referrals for the additional services. Indeed, mother had indicated a recalcitrance to complete the second round of services.

Second, mother failed to benefit from the services she had completed. The social worker, both in her reports and in her testimony, reported that mother was not benefitting from the services she had completed. The social worker testified at the contested 18-month hearing that she recommended termination of reunification services because "[t]here are still safety concerns that have not been mitigated through case plan service classes." The risk to the children involved mother's continued aggression and lack of parenting skills.

26

The social worker was concerned primarily with aggressive behaviors by mother. The social worker did not believe that the children were at risk in the care of father, but recommended not returning children to him "[b]ecause the mom and the dad are still in a committed relationship together and reside together." "The father has not demonstrated the ability to intervene when the mother has negative behaviors and lack of protective capacity when the mother has negative behaviors; does not redirect and does not step in and deescalate the situation."

The social worker testified that during one visit with the children "there was aggressive and hostile language that was being exchanged between . . . the mom and the foster parent" in front of the children. The social worker reported that mother laughed during one visit when C.C. hit G.C. with a jump rope; mother also threatened to leave the visit early when the children did not follow her directions. The social worker noted that during an unsupervised video chat between mother, G.C., and M.C., "mother had been arguing with [G.C.] very loud[ly] and [M.C.] was heard in a firm and loud voice to request mother and [G.C.] to stop arguing. After the visit, [the] children's behaviors increased to whining, crying and taking each others' items." Mother had probed the children regarding their foster home placements. Mother had challenges redirecting the children during visitation when they were displaying negative behaviors. Mother told J.C. they were going to make the foster parents lose their license. The court rendered an express finding that mother had not benefited from her services.

Third, even father had begun to engage in problematic behavior. The foster parents, with whom J.C. and C.C. had been living for over a year, requested the children

27

be removed due to the parents' accusations to law enforcement that the foster parents were abusing the children. "Approximately four . . . referrals alleging child abuse by the foster parent has been telephoned in . . . for investigation over . . . two months. The referrals were not supported with evidence of abuse as allegations were denied by the minor children." During a video visit with G.C., the parents opened his birthday presents; he did not receive the gifts until two weeks later: "This upset the child very much, and the child ended up losing his placement as a result of his behaviors that began to escalate from that visit until the child was actually removed because he was very upset over what had happened on this birthday visit that they opened up his gifts, and he did not have his gifts. And his behaviors just began to spiral out of control." Thus, the evidence that mother had failed to complete her services, failed to benefit from the services she had completed, and both parents continued to engage in problematic behaviors supported the court's finding of detriment because placement with father would result in the children living with mother, who could not effectively parent the children.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

SLOUGH
J.

RAPHAEL
J.

28